UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PHILIP RAPPA,

                    Plaintiff,

          -against-

CONNECTICUT GENERAL LIFE
INSURANCE COMPANY AND THE
LUCENT TECHNOLOGIES INCORPORATED
LONG TERM DISABILITY INCOME PLAN
FOR MANAGEMENT EMPLOYEES,

                    Defendant.
-----------------------------------------------------------------X

NOT FOR PUBLICATION

**MEMORANDUM & ORDER**

06-CV-2285 (CBA)

AMON, United States District Judge:

          Plaintiff Philip Rappa filed his complaint on May 17, 2006, pursuant to the Employee

Retirement Income and Security Act of 1974 ("ERISA"), seeking to recover past due and

continuing benefits under a group Long Term Disability Plan administered by defendant

Connecticut General Life Insurance Company ("CGLIC").  (Compl. ¶ 1.)  The parties have filed

cross-motions for judgment on the administrative record.  (Pl.'s Mem. of Law in Supp. of his

Mot. for J. on the Record Pursuant to FRCP 52 ("Pl's Br.") at 2; Def.'s Mem. of Law ("Def's

Br.") at 15.)  For the reasons set forth below, plaintiff's motion for judgment on the

administrative record is granted.

I.        **Procedural Posture**

          Both parties seek to have the Court decide the motions before it as motions for a

judgment on the administrative record.  (Pl's Br. at 2, Def's Br. at 15.)  The Second Circuit has

noted that this type of motion is not contemplated by the Federal Rules of Civil Procedure.

1

Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003).  The Muller court noted

that courts sometimes treat this type of motion as a motion for summary judgment pursuant to

Rule 56.  Id.  The court in Muller, however, determined that treating the parties request for a

judgment on the record as summary judgment motions did not make sense in that case, and

therefore construed the district court's decision in that case as a bench trial, given that there is no

right to a jury trial under ERISA and that the court had previously denied summary judgment.

Id.

Neither approach is appropriate here.  Muller involved review of a denial of ERISA

benefits de novo.  In such a case, where the district court is to make factual determinations in the

first instance, a "bench trial on the papers" is clearly the sensible course where the parties seek to

proceed to such a stage.  However, as will be discussed in more detail below, arbitrary and

capricious review is appropriate here.  Under this standard, the district court's role is limited to

merely determining if the decision below was arbitrary and capricious based only on the record

that was before the administrator at the time of decision.[1]  See, e.g., Glockson v. First Unum Life

Ins. Co., No. 7:04-CV-838, 2006 WL 1877140, at *4 (N.D.N.Y. July 6, 2006).  Under such

circumstances, where the district court receives no further evidence, it "sits in effect as an

appellate court to determine whether the denial of ERISA benefits was arbitrary and capricious."

Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F. Supp. 783, 791

(E.D.N.Y. 1994) (further considering the possibility that an analogy to a Rule 12(c) motion for

---

[1]Given this limitation, the only dispute of material fact possible, as a matter of logic, is
one regarding what evidence was in fact in front of the administrator below.  See Robbins v.
Laberge Eng'g & Consulting Ltd., No. 1:01 CV 1738, 2005 WL 2039195, at *6 (N.D.N.Y. Aug
24, 2005) (quoting an unpublished decision of the Second Circuit making the same observation).

judgment on the pleadings is most appropriate). The Court concludes, therefore, in light of recent cases applying the arbitrary and capricious standard as well as the parties joint request, that a review of the administrative record for a final determination of whether or not CGLIC's decision to terminate benefits was arbitrary and capricious is appropriate. See Henar v. First Unum Life Ins. Co., No. 02 Civ 1570, 2002 WL 31098495, at *4 (S.D.N.Y. September 19, 2002); Glockson, 2006 WL 1877140, at *4; Wyant v. Unumprovident Corp., No. 1:04-CV-470, 2006 WL 1373085, at *4 (N.D.N.Y. May 16, 2006); Robbins v. Laberge Eng'g & Consulting Ltd., No. 1:01 CV 1738, 2005 WL 2039195, at *6-7 (N.D.N.Y. Aug 24, 2005) (openly declining "to wrap th[e] motion in the fabric of any specific procedural rule").

I.     **Background**

       A.     Procedural History

Rappa worked for Lucent Technologies Incorporated ("Lucent") as a systems analyst in telecommunications, a sedentary occupation. Rappa was a participant in Lucent's Long Term Disability Plan (the "Plan") pursuant to 29 U.S.C. § 1002(7). On September 18, 1995, after working for Lucent for 25 years, he stopped working due to an orthopedic disability. In December of 1995, he underwent an unsuccessful fusion of his lumbar spine. Following an elimination period, CGLIC approved long term disability benefits for Rappa which continued until CGLIC terminated his benefits effective October 23, 2001.

Plaintiff appealed CGLIC's decision to terminate his benefits to CGLIC on January 23, 2002. CGLIC acknowledged receipt of the appeal on February 22, 2002, and finally issued its decision denying benefits by letter on June 18, 2002. In the June 18, 2002 letter, CGLIC mentioned a review performed by Dr. Kern. Coincidentally, Rappa faxed CGLIC a letter on that

same day explaining that his doctor had diagnosed an aortic aneurysm which required surgery. On August 29, 2002, CGLIC advised plaintiff that he had another 45 days to submit additional documents for review on appeal. However, without waiting the promised 45 days, by letter dated September 4, 2002, CGLIC informed Rappa that he had exhausted his administrative remedies and had no further right to appeal. Rappa responded by submitting additional medical reports to CGLIC on September 18, 2002–well within the initially promised 45 days–but did not receive a response. Thereafter, on October 21, 2003, Rappa filed his initial complaint in this Court, docket number 03-CV-5286. On May 20, 2005, the Court remanded the case pursuant to 29 U.S.C. § 1133(2) to allow Rappa a chance to submit additional evidence for review by CGLIC. Rappa v. Connecticut General Life Ins. Co., No. 03-CV-5286, slip op. (E.D.N.Y. May 20, 2005).[2]

In accordance with the Court's order remanding his case, Rappa sent CGLIC additional medical records on November 17, 2005. Rappa ultimately filed this second suit in this Court on May 17, 2006, after not receiving a response from defendant by that date. However, after filing suit, Rappa received a letter from CGLIC dated May 15, 2006, once again informing him that his claim for benefits had been denied.

B.      Medical Evidence

---

[2] In the May 20, 2005 order, the Court held that "because plaintiff was not given an opportunity to comment on the report of Dr. Barry Kern, upon which the defendant relied in denying his appeal, plaintiff was denied a 'full and fair review' of his claim, in derogation of his rights under ERISA § 503(2), 29 U.S.C. 1133(2). Such a denial of full and fair review was arbitrary and capricious, United States v. Crocco, 137 F.3d 105, 108 (2d Cir. 1998) and this case is therefore remanded in order to give the plaintiff an opportunity to address the report of Dr. Kern and to submit additional records."

Rappa first filed for long term disability benefits on June 11, 1996. (R. 952.) With his

claim, Rappa submitted a report from Dr. Jeffrey Spivak, dated April 9, 1996, indicating that

Spivak had seen Rappa first on October 24, 1995, for lower back pain. (R. 958-62.) An X-ray

revealed Grade II spondylolisthesis at L4-5 with significant degenerative features and collapse,

and an MRI showed nerve root compression in that location. (R. 959.) Follow up tests

confirmed these findings and Dr. Spivak performed lumbar fusion on Rappa on December 6,

1995. (R. 794.) Post-surgery, Rappa's lower back pain continued, and Dr. Spivak diagnosed

"possible chronic right L4 nerve damage." (R. 960.) Spivak informed the patient that the fusion

had failed. Additional surgery was a possibility. (R. 909.) Dr. Spivak completed a Physical

Capacity Evaluation form and indicated that plaintiff was unable to perform a full range of

sedentary work. (R. 963-64.) He noted that Rappa could not sit for more than 15 minutes at a

time nor stand and/or walk for more than 15 minutes at a time. (R. 963.) He further indicated

that Rappa could only sit and stand/walk for a total of two hours each in an eight hour workday.

(R. 963.) Accordingly, Spivak opined that Rappa would have to recline "frequently" during an

eight hour workday. (R. 963.) On October 10, 1996, CGLIC approved Rappa's claim for long

term disability benefits. (R. 786.) Dr. Spivak submitted continuing treatment notes to CGLIC.

On April 3, 1997, CGLIC advised Rappa that the definition of disability under his plan was

changing to require him to be unable to work "any occupation." (R. 752.) On July 28, 1997,

CGLIC informed Rappa that he qualified for benefits under the "any occupation" definition.[3] (R.

---

[3]It should be noted that this change was relatively insignificant for Rappa, because his prior work as a systems analyst was sedentary. The change from defining "disabled" in terms of the claimant's prior occupation to in terms of "any occupation" was far more significant for those whose prior occupation involved more physical exertion.

691.)

On March 19, 2001, CGLIC requested updated medical information from Rappa. (R. 582.) In response to this letter, Rappa submitted a Disability Questionnaire that he prepared, a statement prepared by Dr. Vergara,[4] a primary care physician, and Physical Ability Assessment form prepared by Dr. Fisk, Rappa's cardiologist. In this same time frame, Rappa also indicated to CGLIC that he had not been to the doctor for his orthopedic problems in more than two years. (R. 494.)

The Disability Questionnaire recounts Rappa's failed attempt to have his back problems treated surgically in 1995. (R. 572.) Rappa states that the surgeon removed his vertebrae, placed a metal plate in his back and performed spinal fusion–which failed. (R. 572.) He also points out that he has a bleeding ulcer which prevents him from taking muscle relaxers or any other medicine to ease his back pain. (R. 572.) With regard to his daily activity, Rappa reports that he rarely leaves his house for over an hour, but that he does walk about a half-mile, slowly, 2 or 3 times per week. (R. 572-73.) He further states that because he cannot take pain medication, the only way he can relieve the pain is to lay down–which in turn severely restricts his daily activities. (R. 572.) Moreover, the inability to take medication has apparently resulted in some degree of insomnia due to the pain. (R. 572.)

Dr. Vergara's report is dated March 19, 2001. (R. 586.) He indicates, in the "diagnosis" field, that Rappa suffers from a crushed vertebra and valvular heart disease. (R. 585.) Vergara indicates that Rappa's subjective symptoms were low back pain and right leg pain. (R. 585.) In

---

[4]The spelling of Dr. Vergara's name appears to be somewhat in doubt. The Court employs the spelling which appears at the bottom of his report. (R. 586.)

the "progress" field, Vergara indicates that Rappa's condition remained unchanged.  (R. 585.)

With respect to the extent of Rappa's disability, Dr. Vergara writes that he has a "permanent

disability".  (R. 586.)  He further opines that Rappa is not a candidate for rehabilitation, could

not have his present job modified to address his impairments, should not receive vocational

counseling or re-training, and may not commence trial employment.  (R. 586.)  However, in

seeming contradiction with the rest of his report, Dr. Vergara checks off a box which states that

Rappa has a "class 4" physical impairment,[5] which indicates a moderate (as opposed to severe)

limitation of functional capacity, and capability to engage in sedentary activity.  (R. 586.)

Finally, Dr. Fisk's first report, dated May 1, 2001, indicates that Rappa was not limited in

his ability to sit and was not limited by his cardiac diagnosis in his ability to stand or walk.  (R.

561.)  Dr. Fisk then submitted an updated Physical Ability Assessment form dated July 12, 2001,

indicating that Rappa could continuously sit, stand, and walk during an eight hour work day.  (R.

518.)  However, tellingly, in the notes section, Dr. Fisk states that "[Rappa's] current limitations

mostly stem from chronic noncardiac issues."  (R. 520.)  Therefore, read as a whole (and in the

context of the entire record), it is clear that Dr. Fisk's conclusions relate only to Rappa's heart

conditions, and not to his far more extensive orthopedic problems.

On August 3, 2001, CGLIC determined that it was necessary to conduct a Functional

Capacities Evaluation ("FCE") to determine whether Rappa remained totally disabled.  (R. 495.)

The FCE was conducted on September 25, 2001, by a physical therapist, Wendy M. Trivilino,

and the evaluation lasted for approximately two hours.  (R. 454-56.)  Rappa's wife drove him 2

---

[5]A class 4 impairment is the second most severe listing, behind only class five, which
indicates severe limitations and the complete inability to do sedentary work.

1/2 hours to the FCE site, and he reported that this amount of time in a sitting position increased his back pain considerably. (R. 454.) Apparently, after 15 minutes in a sitting position in the waiting room, he had to get up and move around. (R. 454.) Rappa stated to Trivilino that prolonged sitting increases his pain, and that he almost never sits for any prolonged period of time. (R. 454.) He further explained to her that he does nothing all day but remain lying on the couch–the only comfortable position for him. (R. 454.) He further stated that he has difficulty transferring from a sitting position to standing and difficulty dressing and putting his shoes on. (R. 454.) Rappa told Trivilino that he walks about twice a week for about a half mile. (R. 454.) A muscoloskeletal screen revealed severe limitations in lumbar AROM in all planes, and Rappa was unable to keep pace for three minutes on a cardiovascular step test. (R. 454-55.) Moreover, Rappa was unable to complete a portion of the functional testing because he stated that he was completely unable to bend forward and would not attempt to do so. (R. 455.)

After only two hours, and despite all of these observations, Trivilino concluded that Rappa has limitations in the light physical demand level, but that he could sit for prolonged periods of time with positional changes every 30 minutes and stand and walk on a frequent basis. (R. 455.) Accordingly, she concluded that he could function in the sedentary physical demand level for a period of eight hours. (R. 456.) CGLIC then obtained a Transferrable Skills Analysis ("TSA") from a rehabilitation specialist, who–based entirely on Trivilino's conclusion regarding Rappa's ability to function–found that there were four jobs that Rappa could perform in light of his vocational background. (R. 451.) On November 11, 2001, based on the FCA and TSA, CGLIC revoked Rappa's long term disability benefits.

On December 3, 2001, Rappa appealed CGLIC's adverse determination. On January 23,

2002, Rappa sent CGLIC additional information to review, including a report from Dr. Gilbert

dated June 19, 1997 (R. 397-98), a letter from Dr. Reitberg dated August 1, 1996 (R. 907-10),

and an independent medical examination by Dr. Kim dated January 3, 2002 (R. 403-6). (R. 400-

2.) Dr. Gilbert examined Rappa on June 17, 1997. First, he recounted Rappa's history of

orthopedic problems–noting that they began in 1989 and that in 1995 he was diagnosed with

spondylolisthesis L4, 5 with degenerative disc disease right greater than left with nerve root

compression. (R. 397.) He further stated that surgery was unsuccessful, and that since then,

Rappa has reported that he is unable to sit for more than a half hour or stand for more than 15

minutes. (R. 397-98.) After finishing his examination, Dr. Gilbert concluded:

> Mr. Rappa demonstrates evidence of continued L4 on the right nerve root
> dysfunction with atrophy, pain, decreased sensation and decreased right ankle
> jerk. This correlates with patient's findings at time of surgery of L4 nerve root
> compression. Patient is totally disabled and still demonstrates evidence of right
> L4 nerve root damage. *Disability is permanent. Patient who was a systems
> analyst is incapable of working as such because of intractable pain with inability
> to sit or stand more than half an hour.* (R. 398 (emphasis added).)

Dr. Reitberg examined Rappa on July 25, 1996. (R. 907.) Rappa told him that his back

problems started in 1989 or 1990. (R. 907.) Dr. Reitberg's report then discusses how Rappa's

condition worsened in 1995, and that Dr. Spivak performed the lumbar fusion, but that Spivak

had told Rappa that the fusion had failed. (R. 907.) Under "present complaints", Dr. Reitberg

reports that Rappa reported low back pain, a numb right leg, and that he cannot stand or walk for

long periods. (R. 908.) He further notes that Rappa reported that "no relief at all" resulted from

the surgery. (R. 908.) Dr. Reitberg then reviewed Rappa's medical records, noting Dr. Spivak's

opinion that Rappa would be totally disabled and that his condition was unimproved after the

surgery. (R. 908.) Reitberg observed that the records reveal that Rappa was suffering from

spondylolisthesis at L4-5 with "significant degenerative features and collapse", severe right side nerve root compression, chronic right L4 nerve root damage, lumbar scoliosis, and degenerative disc disease. (R. 908-09.) Then, after conducting his own physical examination of Rappa, Dr. Reitberg concluded:

> Mr. Rappa has a severe low back condition due to spondylolisthesis. He has had surgery with internal fixation, discectomy and fusion. He remains symptomatic and the fusion has not completely healed yet and, indeed, may not. It is possible that further surgery will be necessary. There are significant findings in the low back, as mentioned above, with significant atrophy in the lower extremity, as mentioned above. *In my opinion, his condition is permanent and will not improve.* He cannot bend, lift, squat, crawl or climb. *His sitting capacity is not more than a half hour at a time, and his standing capacity and walking capacity are not more than fifteen minutes at a time. He would require lying down many times throughout the day. He is totally and permanently disabled.* Even if the fusion heals, it appears to me that he has significant radiculopathy, which appears to be permanent. While the fusion mass has to be followed with appropriate testing, such as x-rays and CT scans, it is my opinion that this is a permanent condition, and even if the fusion heals, he will be left with a permanent total disability related to his low back. (R. 909-10 (emphasis added).)

Dr. Kim examined Rappa on January 3, 2002. (R. 403.) His report begins by discussing Rappa's medical history (both orthopedic and cardiac), most notably the failed lumbar fusion surgery in 1995. (R. 403-04.) Dr. Kim then reports that he conducted an extensive examination of Rappa, including a neurologic examination, a spinal examination, a motor examination of the upper extremities, a motor examination of the lower extremities, a test of deep tendon reflexes, a sensory examination, and a gait analysis. (R. 404-05.) After doing so, Dr. Kim listed the following impressions:

> 1. Status post lumbar L4 laminectomy with instrumentation and fusion and failed back syndrome.
> 2. Residual findings of bilateral extremity radiculopathy present right L4, L5 and S1 findings with mild weakness in the right knee extensor, weakness in the right extensor hallucis longus and markedly diminished right ankle jerk as well as findings on the left with small calf and thigh circumference with findings of

10

muscle atrophy.
3. Findings also suggestive of possible right meralgia paresthetica.
4. History of coronary artery disease with previous myocardial infarction.
5. History of gastric ulcers.
6. History of COPD.  (R. 405-06.)

Finally, Dr. Kim opined: "Presently I believe Mr. Rappa is permanently disabled.  *Presently I do not believe he can perform even sedentary positions* due to the fact that he has difficulty sitting for any extended amount of time and he has to frequently change positions. ...  This is to within a reasonable degree of medical certainty."  (R. 406 (emphasis added).)

In response to the evidence submitted by Rappa, CGLIC arranged for Dr. Kern to do a peer review of Rappa's file to make an independent determination without examining Rappa. (R. 395.)  On April 17, 2002, Dr. Kern reviewed Dr. Kim's report, the FCE, records from Dr. Fisk, Dr. Gilbert's report, notes from Dr. Spivak, and the report of Dr. Reitberg.  (R. 112-13.) Dr. Kern reports that he was asked by CGLIC to address five questions, which he does in turn. First, Dr. Kern was asked whether or not, based only on the data complied in the FCE, Rappa could perform full-time sedentary work, and Kern concluded that he could because he had demonstrated the ability to sit for thirty minutes, which could be accommodated in the workplace.  (R. 113.)  Kern does not explain why or how this disability would be accommodated.         Second, Dr. Kern was asked to whether or not he agreed with Dr. Kim's conclusion that Rappa could not work at any exertional level, and he states that he does not, because he believes that Dr. Kim based his opinion on the subjective reporting of the patient, though Kern does not indicate why this is inappropriate.  (R. 114.)  The record, however, indicates that Dr. Kim thoroughly examined Rappa–quite unlike the "medical report" offered by Dr. Kern on only the paper record that he was provided by CGLIC.  (R. 405-06.)  Moreover, in

response to this query, Dr. Kern asserts that Rappa "is not even taking pain medications" and that "[c]hronic pain is not of itself disabling as there are many methods of treating it." (R. 114.) However, it appears that Dr. Kern offered this opinion without knowledge of the bleeding ulcers which have severely limited Rappa's ability to obtain treatment for the pain caused by his condition.

Third, CGLIC asked Kern to opine on the diagnosis of failed back syndrome. (R. 114.) In answering this question, Kern notes that Rappa's back pain "was not totally relieved" by the lumbar fusion surgery–despite the fact that all of the records he reviewed indicated that the pain was not relieved at all. (R. 114.) He then concludes that Rappa's orthopedic issues do not effect his functionality to perform sedentary work. (R. 114.)

Fourth, Kern opines that COPD and CAD effect Rappa's ability to do heavy, but not sedentary, work. (R. 114.)

Fifth and finally, CGLIC asks what effect Rappa's seven years out of work would have on his current ability to work, and Kern opines that he would suffer from some level of "deconditioning" due to the layoff, but would be able to perform full-time sedentary work within 2 weeks. (R. 114.)

In addition to limitations stemming from his orthopedic problems, Rappa complained of claudication type symptoms beginning on September 28, 2001 and was directed to follow up with a vascular specialist. (R. 329.) He was then diagnosed with an abdominal aortic aneurysm by Dr. Kim on April 24, 2002. (R. 296.) He underwent surgery for this condition on June 27, 2002. (R. 333.) He subsequently had follow up surgery for this condition.

## II.     Discussion

A.     Standard of Review

Rappa brings this challenge to CGLIC's decision to discontinue and deny him benefits under 29 U.S.C. § 1132(a)(1)(B).[6] (Compl. ¶ 1.) CGLIC argues that it is entitled to deferential review by this Court of its determination that the plaintiff is not entitled to long term disability benefits. (Def's Br. at 15.) The Supreme Court has said that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). The Second Circuit has elaborated that "[w]here the plan reserves such discretionary authority, denials are subject to the more deferential arbitrary and capricious standard, and may be overturned only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) (internal quotations omitted); see also Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208, 211 (2d Cir. 2006).

Here, the policy gives the defendant discretionary authority. (R. 1052.) It states: "The Claims Administrator shall serve as the final review committee under the Plan and shall have sole and complete discretionary authority to determine conclusively...eligibility for benefits...." (Id.) Thus, under the case law, barring an exception, the Court would review the defendant's

---

[6]Rappa also argues–as he did successfully in his prior action–that he did not receive the benefit of a full and fair review, pursuant to 29 U.S.C. § 1133(2). He asserts that on remand, CGLIC did not, as required by ERISA regulations, consult with a health care professional to decide the appeal. This contention is without merit. In its letter dated May 15, 2006, CGLIC stated that a Nurse Case Manager and an Associate Medical Director reviewed Rappa's results to two tests. (R. 7.) The letter also indicates that medical experts reviewed two additional submissions. (Id.) Accordingly, this claim is without merit.

decision under the arbitrary and capricious standard.

However, Rappa argues that the Court should nevertheless review CGLIC's decision to stop his long term disability benefits *de novo*, because in this case, the CGLIC did not render a timely decision that merits the deferential "arbitrary and capricious" review. (Pl.'s Reply at 1.) Under the ERISA regulations applicable to this claim,[7] CGLIC was obligated to render its decision within 60 days of receiving the request for review.[8] 29 C.F.R. § 2560.503-1(h)(1)(i) (2000). Under the Department of Labor regulations applicable at the time, if a decision is not rendered in the time prescribed the "claim shall be deemed denied on review." 29 CFR § 2560.503-1(h)(4) (2000). The Department of Labor explained that it included that provision "to clarify that "procedural minimums of the regulation are essential to procedural fairness and...a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference." 65 Fed. Reg. 70246, 70255 (Nov. 21, 2000).

Plaintiff cites to Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98 (2d Cir. 2005) in support of his argument that this Court should apply *de novo* review of the CGLIC denial post-remand. In Nichols, as in this case, the defendant did not communicate with the plaintiff within the applicable 60 day period after the plaintiff had requested review. Id. at 105. The defendant informed plaintiff on the 67th day that it had received the request and was performing a review. Subsequently, the defendant sent plaintiff a letter explaining that it could not render a decision

_____

[7] Plaintiff asserts that the pre-January 1, 2002 version of the Code of Federal Regulations applies to this action because Rappa originally filed his claim in 1999. The current version of the code gives the insurer less, not more, time so the earlier version is advantageous to CGLIC.

[8] If CGLIC informed Rappa within the initial 60 day period that special circumstances applied, it could have obtained a maximum of 120 days. 29 C.F.R. § 2560.503-1(h)(2) (2000). CGLIC never informed Rappa of the need to extend the time and thus the 60 day period applies.

without an independent medical examination being submitted.  The plaintiff commenced the lawsuit 197 days after the day of her letter, in the absence of a formal decision.  Id. at 105-06. The Second Circuit determined that a plan's failure to award benefits within the period specified by the regulations permits a claimant to consider his claim to be deemed denied so that he can seek judicial review.  Id. at 106.  The Court went on to determine that a "deemed denied" claim is entitled to de novo review, since it does not represent the exercise of any discretion on the part of the plan administrator.  Id. at 109.

Subsequently, in Demirovic v. Bldg. Serv. 32 B-J Pension Fund, 467 F.3d 208 (2d Cir. 2006), the Second Circuit re-examined the Nichols decision in the context of a case in which the plan administrator had not timely issued its initial determination but ultimately denied the plaintiff's appeal before the plaintiff filed her lawsuit.  The Demirovic court distinguished Nichols and found that the arbitrary and capricious standard was appropriate because the plan administrator's "eventual decision constitute[d] a final decision and exercise of the Fund's discretion, to which [the court] must defer."  Id. at 212.

In this case, after remand, Rappa began his second request for review by submitting additional medical records to CGLIC on November 16, 2005.  This document was date stamped by CGLIC on November 23, 2005.  (R. 119.)  Accordingly, CGLIC should have rendered its decision by January 22, 2006, 60 days counting from the day the document was date stamped by CGLIC.  Rappa commenced this action on May 17, 2006, 175 days after CGLIC received his request for review.  CGLIC finally rendered its decision on Rappa's request for review in a letter, dated two days earlier, on May 15, 2006–173 days after Rappa's request was date-stamped.  Rappa states that he did not receive that letter until after he filed this lawsuit.  Given

the mere two day difference of the date of this lawsuit and the date CGLIC's letter was sent, the Court credits the plaintiff's assertion.

Therefore, the instant case does not fall directly under either <u>Nichols</u> or <u>Demirovic</u> since Rappa filed his lawsuit before receiving the unfavorable decision of CGLIC, which did exist prior to his filing suit. However, CGLIC did render a decision denying Rappa's appeal before the lawsuit had been filed. Therefore, there is a decision for the Court to defer to, as in <u>Demirovic</u> but not <u>Nichols</u>, and the Court will review it under the arbitrary and capricious standard. Accordingly, the CGLIC's decision may only be overturned if the Court finds that it was without reason, unsupported by substantial evidence, or erroneous as a matter of law.

B.      Application of Standard to Facts

Under Rappa's plan, he was entitled to long term disability benefits if, after 52 weeks of being disabled, he was "unable to do any job for any employer for which [he was] qualified or may reasonably become qualified by training, education, or experience other than one that pays less than 60% of [his] eligible base pay at the time [he] became disabled, and [a]t all times during disability, [he] must be under a physician's care and following the recommended course of treatment to receive benefits." (R. 6.) Rappa argues that the termination of his long term disability benefits was not based on substantial evidence and should therefore be reversed.[9] Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Brown v. Apfel</u>, 174 F.3d 59, 61 (internal quotations

---

[9]Because Rappa argues that a *de novo* standard applies in this case, he contends that all that he is required to show is that CGLIC's decision was not supported by a preponderance of the evidence standard. Nevertheless, he correctly argues that, in any event, CGLIC's decision was not even supported by substantial evidence and was thus arbitrary and capricious.

omitted).  The Court is mindful that while limited, "review of a determination under th[is] standard is more than a[] perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits.  Rather, such a review must include a searching and careful determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rationale and not arbitrary."  Rizk, 862 F. Supp. at 789 (internal quotations omitted).  With this standard in mind, the Court now turns to the portions of the record which CGLIC claims supports its determination that Rappa was not entitled to benefits.

1.  *CGLIC's termination of long term disability benefits was not based on substantial evidence*

a.  The FCE

CGLIC relies heavily on the determination of the FCE commissioned by CGLIC.  Rappa disputes the diagnostic value and in particular the conclusions reached by the FCE.  The Court agrees with Rappa that there is no reasonable basis for the conclusions reached by the physical therapist in the FCE.  For instance, she concludes that Rappa can sit for a prolonged period with positional changes after 30 minutes, but does not indicate that she observed Rappa sit for a prolonged period of time–and in fact the entire evaluation only lasted for two hours.  (R. 454, 55.)  Furthermore, in contradiction to her conclusion, she observed that he had to get up and move around the waiting room after only 15 minutes.  (R. 454.)  Additionally, she reached this conclusion after noting and apparently crediting that Rappa's pain was increased considerably after the 2 1/2 hour car ride to the evaluation, that he "never sits except for today in the car and during the evaluation," that he struggles with dressing activities including putting his shoes on, and that "[h]e reports doing nothing during the day and that he just lays on his couch all day as

that is the only position that is comfortable." (R. 454.) Moreover, she does not address how his asserted complete inability to bend forward could be accommodated in the work place. (R. 455.) Therefore, the Court concludes that the FCE is suspect and does not provide a sufficient basis on which to deny Rappa's benefits.

b.    The TSA

The TSA was based entirely on the faulty FCE and therefore cannot be relied upon. The conclusion therein–that Rappa can do certain sedentary jobs and is therefore not disabled[10]–rests on the conclusion reached in the FCE, that Rappa can sit for a period of 30 minutes at a time. As is shown above, Drs. Spivak, Gilbert, Reitberg, and Kim all agree with the notion that Rappa can sit for no more than 30 minutes at a time.[11] (R. 398, 406, 909-10, 963.) However, contrary to the TSA, all of the examining physicians agree that Rappa's inability to sit for more than 30 minutes precludes his ability to do sedentary work–including his prior job as a systems analyst. They all suggest that Rappa would be unable to sit for consecutive 30 minute intervals with only a short break between each, but rather would have to spend longer amounts of time between each interval reclining in order to ease the pain caused by 30 minutes of sitting. The FCE seems to assume, without medical evidence, that Rappa could simply stretch or change position and remain sitting throughout the day. That conclusion is inconsistent with the rest of the record.

In addition to being inconsistent with the conclusions of the examining doctors, the

---

[10]In fact, the TSA concludes that Rappa can do his prior job as a systems analsyt, despite the fact that Dr. Gilbert, for instance, specifically noted that Rappa, "who was a systems analyst is incapable of working as such because of intractable pain with inability to sit or stand for more than half an hour." (R. 398.)

[11]Dr. Spivak actually concluded that Rappa could sit for only 15 minutes at a time, the others seem to agree that Rappa can sit for 30 minutes.

TSA's (and by extension, CGLIC's) determination that Rappa's ability to sit for up to 30 minutes at a time confers upon him the ability to do sedentary work is contradicted by CGLIC's own prior conclusion that Rappa was totally disabled. The reports from the doctors indicating that Rappa can sit for up to 30 minutes at a time–which the FCE agrees with–range from 1996-2002, dated both before and after the termination of Rappa's benefits. This indicates that Rappa's condition has not improved since the time period during which he was receiving benefits. In fact, there is not one piece of evidence in the record which indicates that Rappa can sit for more than 30 minutes at a time, the capacity at which CGLIC provided him benefits up until late 2001. Quite to the contrary, as is laid out above, Dr. Vergara explicitly noted that Rappa's back condition has not progressed and all of the other doctors who examined Rappa regarding his orthopedic issues indicated that his condition did not improve after his lumbar fusion surgery and opined that Rappa would be totally and permanently disabled.

Accordingly, despite CGLIC's position that Rappa has improved, there is no sound basis in the record to conclude that Rappa's back condition, which CGLIC originally found to be disabling with respect to his prior occupation, has in fact improved. Decisions to terminate benefits in the absence of a change in condition have been held to have been arbitrary and capricious. See Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 136 (2d Cir. 2001) (a "reversal in policy preceded by no significant change in [plaintiff's] physical condition" is reason to accord less weight to the defendant's evidence); McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 589 (8th Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."). Therefore, the TSA's

conclusion that Rappa can do certain sedentary jobs because he can sit for up to 30 minutes at a time does not provide CGLIC with a sufficient basis on which to deny Rappa's benefits.

c.     The Medical Evidence

CGLIC also based its decision to deny Rappa's benefits on Dr. Fisk's and Dr. Vergara's reports that he was capable of sedentary work, and on the report prepared by the doctor it hired to evaluate Rappa's record, Dr. Kern.  This evidence is insufficient to substantiate CGLIC's decision to deny Rappa benefits.  With respect to Vergara and Fisk, CGLIC concedes that "neither of these physicians possessed the appropriate medical specialty necessary to evaluate Rappa's orthopedic disabilities."  (Def's Opp. at 8.)  Indeed, a careful examination of either report reveals that neither can be relied upon to support the conclusion that Rappa was not disabled.  First, though Vergara checked a box on a form that indicated that Rappa was capable of sedentary work, he further indicated on the same form that he was permanently disabled. Moreover, Dr. Vergara further opined that Rappa is not "a suitable candidate for further rehabilitation services," could not have his present job modified to allow for his impairment, could not commence trial employment, and did not recommend vocational counseling or retraining.  (R. 585-86.)  CGLIC has offered no reason as to why it would consider the mere "sedentary" work check mark but ignore these other, significant portions of Dr. Vergara's opinion relating directly to Dr. Vergara's ability to work.  The Court concludes that whatever weight that the checked box might have carried on its own is entirely defeated by the fact that the rest of the document contradicts it and counsels heavily in favor a finding that Rappa is disabled and cannot work.  Therefore, Vergara's report is not a basis on which to deny Rappa benefits.

Second, Dr. Fisk, a cardiologist, was the only examining doctor who concluded that

Rappa was able to do sedentary work.  However, Fisk indicated that Rappa's problems were

mostly "noncardiac" and therefore he was not the proper expert to determine Rappa's condition.

(R. 520.)  A logical reading of Fisk's report is that he is listing Rappa's cardiac limitations and

not commenting on the limitations stemming from his orthopedic issues–which provided the sole

basis for Rappa's entitlement to benefits up until October of 2001 and which have never eased.

Thus, Dr. Fisk's report offers no credible evidence regarding Rappa's orthopedic limitations and

was not a proper basis on which to deny Rappa benefits.

Additionally, Dr. Kern's report can not reasonably be relied upon in the face of the

substantial contradictory evidence from Rappa's treating and examining physicians.  Foremost,

Kern's report was not based on any interaction with Rappa, but rather merely on review of the

paper record.  Further, rather than prepare his own independent report, Dr. Kern was merely

given five specific questions by CGLIC–which were all answered in CGLIC's favor.  Moreover,

in answering those questions and concluding that Rappa could return to work, Kern fails to

adequately and credibly rebut the findings of Rappa's treating physicians.  Dr. Kern's report

does not constitute substantial evidence.  It directly contradicts the opinions of the examining

physicians, all of who stated that Rappa is permanently disabled and could not return to work.[12]

It provides no reasons for why he disagrees with them.  By contrast, with the exception of Dr.

Vergara's inconsistent and somewhat confusing statement, the examining physicians (Drs.

Spivak, Gilbert, Reitberg, and Gilbert) all clearly provided the basis for their conclusions and

stated them without equivocation–and those conclusions are far more probative that Dr. Kern's.

_____

[12]The Court excludes Dr. Fisk from this tally because it has concluded that he only
evaluated Rappa's heart-related ailments.

See Soron v. Liberty Life Assurance Co. of Boston, No. 5:02CV1514, 2005 WL 1173076, at *12 (N.D.N.Y. May 2, 2005) (discussing the logically superior probative value of reports prepared by treating physicians as compared to the lesser value of those prepared by non-examining reviewers).

In short, the evidence relied upon by CGLIC (skewed readings of the reports of Drs. Vergara and Fisk, Kern's response to CGLIC's questions, and the FCA and TSA) is, in light of the opinions of Rappa's examining physicians and the lack of evidence that Rappa's condition has improved, insubstantial. Because CGLIC's decisions to terminate Rappa's benefits and then deny their reinstatement were not based upon substantial evidence, they were arbitrary and capricious.

2.      *Reversal is Appropriate*

The Court will reverse the decision of the CGLIC and grant benefits to Rappa. Where the decision to deny benefits is unreasonable because it was not based upon substantial evidence, as was the case here, reversal, rather than remand, is appropriate. See Zervos v. Verizon N.Y., Inc., 277 F.3d 635, 648 (2d Cir. 2002); Zuckerbrod v. Phoenix Mutual Life Ins. Co., 78 F.3d 46, 51 n.4 (2d Cir. 1996).

III.     **Conclusion**

Rappa was improperly denied long term disability benefits by CGLIC.  Accordingly,

plaintiff's motion is granted insofar as CGLIC's termination of his benefits is reversed.  This

matter is hereby referred to Magistrate Judge Azrack for an inquest and a subsequent report and

recommendation regarding the appropriate amount of benefits and attorney's fees.


SO ORDERED.

Dated:          Brooklyn, New York
                December 11, 2007

                                        Carol Bagley Amon
                                        United States District Judge